

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-25-00489-CV

**IN THE INTEREST OF K-K.J.B.**, a Child

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-02082
Honorable Nadine Melissa Nieto, Judge Presiding

Opinion by:    Velia J. Meza, Justice

Sitting:       Lori I. Valenzuela, Justice
               Adrian A. Spears II, Justice
               Velia J. Meza, Justice

Delivered and Filed: November 19, 2025

AFFIRMED

Father brings this appeal challenging the termination of his parental rights to his child, K-K.J.B.[1] In one issue, Father contends that evidence was factually and legally insufficient to support the finding that termination was in K-K.J.B.'s best interest. Concluding that the evidence was legally and factually sufficient, we affirm the trial court's order.

## BACKGROUND

The Department of Family and Protective Services filed its petition for protection, conservatorship, and termination of Mother and Father's parental rights in December of 2021. In

---

[1] To protect the identity of the child and persons through whom the child could be identified, we will refer to appellant as "Father" and to the child by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8. Mother's parental rights were previously terminated by the trial court; however, she did not appeal such judgment.

its petition, the Department alleged that Father knowingly placed or allowed K-K.J.B. to remain in conditions or surroundings which endangered her physical or emotional wellbeing; constructively abandoned K-K.J.B.; failed to comply with the provisions of his family service plan; used controlled substances in a manner that endangered K-K.J.B.'s health or safety and failed to complete a substance abuse treatment program; and engaged in criminal conduct. In May of 2023, a jury trial was held, at the conclusion of which, Mother's parental rights were terminated.[2] Although the jury did not terminate Father's parental rights, the Department was named permanent managing conservator over K-K.J.B.

On December 13, 2023, the Department filed its petition to modify the court's prior order and again sought to terminate Father's parental rights. On July 15, 2025, a second jury trial was held. The jury heard testimony from Father, the Department's case workers and investigator, as well as individuals who worked with K-K.J.B. After the conclusion of trial, the jury terminated Father's parental rights pursuant to section 161.001(b)(1)(D), (E), (N), (O), and (P) of the Texas Family Code. The jury also found that the termination of Father's parental rights was in K-K.J.B.'s best interest. This appeal followed.

## DISCUSSION

In his sole issue on appeal, Father contends that the evidence presented was legally and factually insufficient to support that the termination of his parental rights was in K-K.J.B.'s best interest.

1.  Standard of Review

The legal and factual sufficiency standards of review are well settled.

---

[2] The appellate record before us did not contain the reporter's record from the original jury trial for our review.

In accordance with a legal sufficiency review, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Viewed in this light, we must "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* As such, "all [disputed] evidence that a reasonable factfinder could have disbelieved" is disregarded. *Id.* Consequently, if "no reasonable factfinder could form a belief or conviction that the matter that must be proven is true," then we will conclude that the evidence is legally insufficient. *Id.*

Under a factual sufficiency review, we "must give due consideration to the evidence that the factfinder could reasonably have found to be clear and convincing." *In re A.A.R.*, No. 04-15-00464-CV, 2016 WL 231964, at *1 (Tex. App.—San Antonio Jan. 20, 2016, no pet.) (mem. op.) (citation omitted). In doing so, we "consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding." *In re W.D.*, No. 10-18-00339-CV, 2019 WL 1291111, at *1 (Tex. App.—Waco Mar. 20, 2019, no pet.) (mem. op.) (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Only if the disputed evidence is so significant that the factfinder could not reasonably have formed a firm belief or conviction, will we conclude that the evidence is factually insufficient. *A.A.R.*, 2016 WL 231964, at *1.

2. <u>The Evidence Presented Was Legally and Factually Sufficient to Support the Best Interest Finding</u>

Although "there is a strong presumption that the best interest of a child is served by keeping the child with the parent," *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citation omitted), courts consider several factors in determining the best interest of the child.  A non-exhaustive list of factors laid out by the supreme court include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the

child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

In presenting evidence on these *Holley* factors, there is no requirement that the Department prove them all as a condition precedent to parental termination. *C.H.*, 89 S.W.3d at 27. Thus, the absence of evidence on some factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest." *Id.* We address these *Holley* factors in turn.

## 2.1  K-K.J.B.'s Desires

As to the first factor, K-K.J.B. did not testify, and no other evidence relating to her desires was presented. Without any evidence, this factor is neutral. *In re E.A.R.*, 583 S.W.3d 898, 912 (Tex. App.—El Paso 2019, pet. denied).

## 2.2  K-K.J.B.'s Emotional and Physical Needs

The evidence at trial showed that K-K.J.B. is a non-verbal autistic child with special needs. K-K.J.B. also struggles with walking and fine motor skills. During the three years and seven months preceding the second trial, K-K.J.B. attended daily speech therapy, physical therapy, and occupation therapy sessions for at least an hour a day. Despite the extent of her therapy, K-K.J.B. was unable to identify letters and colors. In fact, according to K-K.J.B.'s special education teacher, K-K.J.B. did "not show awareness to things. She's kind of like—I would say more like, as far as cognitively, she's like a toddler." Due to her cognitive challenges, the Department withdrew K-K.J.B. from public school and moved her to an applied behavior analysis ("ABA") therapy center in January of 2025.

At the ABA center, K-K.J.B. worked thirty hours a week, five days a week with specialists to improve the following four domains: communication, play, social, and adaptation. Ms. Grossman is K-K.J.B.'s board certified behavioral analyst and the clinical supervisor at the ABA center. She testified that although K-K.J.B. was progressing, she would not be ready to graduate from the center for another two to five years.

Thus, the record established that K-K.J.B. requires—and will continue to require—extensive and specialized care.

### 2.3  The Emotional and Physical Danger to K-K.J.B.

In this case, this third *Holley* factor is neutral since no evidence pertaining to K-K.J.B.'s emotional and physical danger was presented.

### 2.4  Father's Parental Abilities and the Programs Available to Assist Him

We consider these factors together, as the evidence regarding Father's parental abilities and the available support programs is interrelated.

Father testified that as a parent, his parental responsibilities are to "[r]aise up, nurture, discipline, . . . love, understand[], motivat[e], [and] inspir[e]" his child. This understanding is based on Father's experience raising his younger brothers, as well as his three other children.  Father testified that K-K.J.B.'s special needs would "be a challenge for sure," and that "dealing with her, . . . it's not going to be an easy fix."  Nevertheless, Father asserted that raising K-K.J.B. would not be "hard" since he is patient and will be "true to" raising his daughter. Father also insisted that he would seek assistance from special needs centers to learn more about K-K.J.B.'s conditions and needs, along with enrolling her "in any furtherance classes."

Despite Father's apparent willingness to improve his parental abilities, during the three years and seven months preceding the second trial, Father never completed his court ordered

parenting course. Father also failed to engage in the ABA center's specialized training to learn how to properly engage with his daughter and what her needs are. According to Ms. Grossman, this training teaches caregivers the techniques the ABA center uses to ensure that K-K.J.B. continues to develop her skills at home. Ms. Grossman also testified that "consistency is key" to K-K.J.B.'s development and if an untrained caregiver does not apply "the same principles . . . in other settings, then . . . , for a lack of a better word, we're wasting our time, because [K-K.J.B.'s progress] won't last." While Father testified that he contacted two special needs facilities, he did not elaborate on the purpose or extent of those communications.

During the pendency of this case, the doctors diagnosed K-K.J.B. with ligament restrictions that required surgical treatment. Although the Department informed Father of the need for surgery, he neither attended K-K.J.B.'s surgery nor spoke with her doctor about it. And without knowing how long K-K.J.B. was required to wear leg braces post-procedure, Father decided to remove them during a visit because, in his opinion, "[t]hey had probably been on too long."

Regarding his visits with K-K.J.B., Father testified that he only missed 15 of his two-hour bi-weekly visits. Disregarding the number of missed visits, it was undisputed that his visits were loving and appropriate. That said, caseworkers who supervised Father's visits expressed concerns. One concern was that Father did not "always seem to understand [K-K.J.B.'s] needs and . . . the level of her disability.". Another concern was Father's failure to change K-K.J.B. during visits or bring necessary supplies. Lastly, "[t]owards the end, [Father] seemed a little more erratic, aggressive," during his visit. Following the observed behavior change, the Department ordered Father to undergo drug testing, which returned a positive result for cocaine.

Finally, "evidence of a parent's criminal history is relevant when evaluating that parent's parental abilities." *In re B.F.*, No. 02-23-00131-CV, 2023 WL 5615867, at *8 (Tex. App.—Fort

Worth Aug. 31, 2023, no pet.) (mem. op.). For this reason, the evidence of Father's arrest and subsequent indictment for allegedly committing a robbery in 2023 is relevant to our review.

2.5  The Plans for K-K.J.B.

Father stated that he would continue to take K-K.J.B. to her therapy sessions, doctor's appointments, and would love her. However, at the time of the second trial, Father conceded that he did not have stable housing or steady employment to support K-K.J.B. In fact, despite having had three years and seven months to arrange stable housing and obtain steady employment, Father testified that he still needed additional time before he could provide for K-K.J.B. When asked how much time, Father could not answer.

In contrast, the jury heard evidence of the Department's plan for K-K.J.B. to find her an adoptive home. One case worker familiar with the adoption process testified that if Father's parental rights were terminated, they could look throughout the entire nation to find her an adoptive family. With this possibility, the Department hopes to find her an adoptive home outside of Texas that "can better help [her] and meet her needs." Additionally, K-K.J.B.'s adoptive family would also be eligible for the "insurance adoption stipend . . . to help" care for her.

2.6  Stability of the Home

Although Father managed to maintain stable housing for eleven months during the pendency of the case, as previously mentioned, at the time of trial he did not have stable housing. Further, Father would need an uncertain amount of time to obtain stable housing.

2.7  Father's Acts or Omissions and Any Excuses

Again, we review these two factors together, as the evidence relevant to each is interconnected.

Father's court ordered service plan required him to take a parenting course, attend counseling, complete a drug treatment program, submit to drug testing, and provide financial support and stable housing for himself and K-K.J.B. Father did not complete his service plan; his stated reasons are addressed below.

With respect to the parenting course and counseling, the Department's case worker testified that Father's excuse was that such services conflicted with his work schedule. However, Father was working on and off, and his only proof of employment was shift work on an app that allowed him to create his own schedule. In response, Father's case worker provided him with the option to complete these services virtually. Father claimed that issues operating Zoom prohibited him from completing virtual services. Moreover, Father testified that he did not feel the need to complete these services since he "wasn't the offending parent" that resulted in the Department's intervention.

As to the drug treatment program, Father testified that such program was for hard drugs, and because he only "partak[es] in a little marijuana here and then," he did not believe he had to complete the program. As to his positive test results for cocaine, Father stated that it was due to receiving procaine or Novocain during hospital visits for his ulcers. On the other hand, the Department's investigator familiar with drug testing testified that there are no prescription drugs which could result in a false positive since "[p]rescription cocaine is not a thing that's legal here in the United States."

3.  Summary

After reviewing the above evidence in the light most favorable to the best interest finding, and considering any undisputed contrary evidence, we conclude the jury could reasonably form a firm belief or conviction that terminating Father's parental rights would be in K-K.J.B.'s best

interest. Moreover, we do not find the disputed evidence to be so significant that the jury could not have formed a firm belief or conviction in favor of terminating Father's parental rights. As such, we conclude the evidence is legally and factually sufficient to support the best interest finding.

We overrule Father's sole issue on appeal.

## CONCLUSION

The evidence is legally and factually sufficient to support that terminating Father's parental rights was in the best interest of K-K.J.B. Accordingly, we affirm the trial court's judgment.

Velia J. Meza, Justice